***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gillen and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Gillen with minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer. *Page 2 
3. Key Risk Insurance Company was the carrier on the risk for defendant-employer.
4. Plaintiff sustained a low back strain and a right ankle sprain on or about
7 December 2007.
5. Plaintiff's low back strain and right ankle sprain arose out of and in the course of employment and are compensable.
6. The following were received into evidence as stipulated exhibits:
 a. The parties' Pre-Trial Agreement, marked as stipulated exhibit 1.
 b. The Industrial Commission Forms and plaintiff's medical records, collectively paginated 1-34 and 1-208 respectively, together marked as stipulated exhibit 2.
 c. Various documents including Industrial Commission Forms and personnel records, collectively marked as stipulated exhibit 3.
 d. Documents regarding Adventure Limousine Services, marked as stipulated exhibit 4.
 *********** ISSUES PRESENTED
1. Whether plaintiff's longstanding chronic mental health problems were exacerbated, materially accelerated, or materially aggravated by plaintiff's compensable injury, and, if so, to what benefits is plaintiff entitled?
2. What, if any, indemnity and/or medical benefits is plaintiff entitled as a result of her compensable injury?
3. Whether the Form 60 filed in this matter should be set aside due to an error involving fraud, misrepresentation, undue influence, or mutual mistake? *Page 3 
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDING OF FACTS
1. At the time of the hearing before the deputy commissioner, plaintiff was 53 years old. Plaintiff has a history of depression, for which she began treatment in 1979. Plaintiff also has a long history of back problems and scoliosis. Plaintiff began working as a pharmaceutical sales representative for Upjohn Pharmaceuticals around 1980 and was diagnosed with bi-polar disorder in 1996.
2. Plaintiff treated with Dr. Michael N. Zarzar at the Glenwood Psychiatric Associates, PLLC from 1993 through 1999, and treated with Dr. Bertha Harvey, a psychiatrist, from 1999-2001. From 2001 forward, plaintiff treated with Dr. Muller, an internist, who treated her depression with medications such as Depatoke.
3. Plaintiff left her position with Upjohn Pharmaceuticals in 1999 for mental health reasons. Plaintiff was out of work on disability for three years. While out of work on disability, plaintiff made jewelry and crafts and later began working as a part-time nurse educator.
4. Plaintiff became employed by defendant-employer as a home healthcare nurse in March 2004. At her first performance evaluation at this job she was placed on probation for not performing to the minimum level of expectations. Prior to plaintiff's work injury, she was increasingly anxious and was having particular difficulties with defendant-employer's computer system.
5. Plaintiff entered into a romantic relationship in July 2004, and by November 2004 was engaged. Plaintiff experienced significant stress during the course this relationship, *Page 4 
including domestic violence perpetrated against her by her fiancé. During one episode, plaintiff's fiancé entered plaintiff's dwelling with an antique axe-like weapon and smashed plaintiff's television. The couple ended their relationship in the summer of 2006.
6. On 7 December 2004 plaintiff fell down a patient's front stairs and hurt her right lower extremity. Defendant-employer directed plaintiff to obtain treatment. Plaintiff sought treatment for this injury at the Craven County Emergency Room on 9 December 2004. Plaintiff returned to work following this accident.
7. On 22 December 2004 plaintiff reported to Dr. Pierce with Coastal Physical Medicine complaining of right ankle and low back pain. At this time plaintiff was diagnosed with a lumbosacral strain and a resolved right ankle sprain. Plaintiff was referred to physical therapy.
8. Plaintiff returned to Dr. Pierce on 29 December 2004, and he diagnosed plaintiff with a lumbosacral strain and right ankle sprain that occurred on 7 December 2004. In addition, plaintiff was diagnosed with a new injury to her right knee that occurred on 23 December 2004. On 19 January 2005 plaintiff was removed from work by Dr. Pierce during a follow-up visit.
9. Plaintiff filed a Form 18 on 20 January 2004 asserting that she had injured her right ankle, right foot, right knee, and lower back in her 7 December 2004 work-related injury.
10. Plaintiff underwent an MRI of her right knee on 20 January 2005. According to Dr. Pierce's 26 January 2005 note, this MRI showed "no evidence of injury to the menisci or ligamentous structures, but there was a surface irregularity in the patellar cartilage."
11. Defendants filed a Form 60 on 24 January 2005 accepting the compensability of plaintiff's 7 December 2004 injury. In the "description of the injury" section, defendants wrote, *Page 5 
in pertinent part, "Slipped off bottom porch step at patient's home. Strained lumbar back, RT ankle and RT knee."
12. Plaintiff underwent an MRI of her lumbar spine on 27 January 2005. According to Dr. Pierce's 2 February 2005 note, this MRI showed "no evidence of high grade spinal stenosis or foraminal stenosis," but did exhibit "a mild left convex thoracolumbar scoliosis." Plaintiff's scoliosis is a pre-existing condition.
13. Plaintiff continued to undergo conservative treatment with Dr. Pierce, and, on
21 March 2005, Dr. Pierce released plaintiff to return to work with restrictions limiting her to work six hours per day with maximum lifting of 15 pounds. Thereafter, defendant-employer offered plaintiff a job that required removing a file from the file cabinet, working on the file, and replacing the file. Plaintiff attempted this light-duty position for a day and a half. Plaintiff testified that she was unable to do the job because of the bending and filing requirements. Plaintiff never returned to work for defendant-employer, formally resigning her employment in September 2005.
14. Plaintiff, without the recommendation of her doctors, ceased taking her Depakote medication for an interval in the spring of 2005. Plaintiff reported to Dr. Godwin on 16 May 2005, complaining of an increasingly severely depressed mood characterized by sadness, anxiety, crying spells, feelings of being overwhelmed, and feelings of hopelessness and helplessness.
15. During the spring of 2005, plaintiff helped to organize a mime show in her local theatre. Diana Midgett testified that, at the end of the mime show, she witnessed plaintiff walk toward the stage from the back of the theater on a downward sloped isle, walk up the stage steps, present a sculpture to the performer, and raise her hands above her head while clapping. *Page 6 
16. Plaintiff returned to Dr. McClurg on 1 June 2005, at which time she complained of continued right knee pain despite physical therapy. Dr. McClurg recommended diagnostic arthroscopy with a debridement of the patellofemoral joint, an evaluation for meniscal or plica band pathology, as well as an evaluation of the fat pads. Plaintiff underwent this procedure on
16 June 2005.
17. Following the 21 March 2005 release given by Dr. Pierce, additional data and medical conclusions regarding plaintiff's fitness to work were difficult to ascertain because of plaintiff's inability or unwillingness to undergo a functional capacity evaluation (hereinafter "FCE") as well as her significant psychological overlay. An FCE was finally completed. Given the information gleaned, on 5 December 2005 Dr. Russakov released plaintiff to return to a medium level of work for an eight-hour day.
18. In September 2005 plaintiff resigned from employment with defendant-employer. Plaintiff's pre-injury position and the light-duty position she attempted were available for plaintiff at the time of her resignation.
19. Plaintiff started working for East Carolina Internal Medicine (ECIM) as a staff nurse in one of its urgent care centers in September 2005. Plaintiff worked for ECIM for approximately 60 days and was terminated for excessive absenteeism. Plaintiff testified that this absenteeism was caused by cancer treatment she received during that time (unrelated to her
7 December 2004 accident) and a hurricane. Plaintiff's termination from ECIM was not related to plaintiff's 7 December 2005 work accident.
20. Plaintiff was seen by Dr. Godwin on 8 September 2005. At this appointment she reported that her plans to start a limousine business were proceeding, and that she was having *Page 7 
trouble in her relationship with her fiancé. Plaintiff did not reference anything significant about her workplace accident at this appointment.
21. Plaintiff returned to Coastal Physical Medicine and Rehabilitation Services on
24 October 2005, at which time she was evaluated by Dr. Alan D. Russakov. Dr. Russakov reported that plaintiff's bone scan was normal, and reported "[a]ll diagnostic studies to this point have been negative and probably overdone." Dr. Russakov also noted "significant emotional overlay."
22. On 15 November 2005 plaintiff filed Articles of Incorporation for her limousine business, "Adventure Limousine Service," with the North Carolina Secretary of State. Plaintiff and her fiancé flew to Colorado to pick up a limousine and then drove back in the limousine over three days. Plaintiff drove for part of this trip. As of the date of the hearing before the undersigned, plaintiff had provided her services for three proms, two weddings, one friend's birthday, the Marine Corps Ball, and had donated an hour for a young girls basketball team, as well as for the Hope Ball. Plaintiff also received many referrals from local marinas to drive from New Bern to Raleigh.
23. Diana Midgett testified that she witnessed plaintiff participating in a local parade hanging out of the sunroof of her limousine and waving at the parade audience in December 2005.
24. Plaintiff has made jewelry and sold it in various places throughout the state, including Oriental and in the mountains. Plaintiff has also considered expanding her jewelry business into Wilmington.
25. Plaintiff was seen by Dr. Godwin on 29 December 2005. At this appointment plaintiff reported that she had lost her job at ECIM after 60 days and that her fiancé may be *Page 8 
ending their relationship. Dr. Godwin observed that plaintiff was tearful and dysphoric related to these stresses, but that plaintiff had a positive attitude about her limousine business.
26. In April 2006 plaintiff fell while on a sailboat and sustained a new injury to her right knee. Following that incident, plaintiff was seen by Dr. McClurg on 20 June 2006. Dr. McClurg diagnosed plaintiff with a new injury following this fall, including a possible medial meniscal tear, and recommended that plaintiff undergo an MRI in order to diagnose fully the right knee condition. Dr. McClurg's medical records demonstrate that this is a new injury that is unrelated to plaintiff's 7 December 2004 work injury.
27. Dr. Godwin continued to treat plaintiff for her psychological problems. Dr. Godwin noted on 20 September 2006 that plaintiff was more severely depressed than he had ever seen her. The only causes he identified were plaintiff's relationship issues and her sailboating knee injury. Dr. Godwin's 20 September 2006 medical record indicates "Everything has been exacerbated by her fiancé ending their relationship recently."
28. Plaintiff also treated with her family physician, Dr. Mark A. Willi, at Oriental Medical Center from 14 December 2005 to 19 January 2007. Dr. Willi's notes indicate that plaintiff saw him and thereby obtained prescriptions for pain medications. Dr. Willi also treated plaintiff for unrelated hand and cervical spine pain. Dr. Willi's notes also mention plaintiff's failed relationship.
29. When asked about the cause of plaintiff's worsening psychological state subsequent to 7 December 2004, Dr. Godwin testified by deposition that there were "lots of causes," including her romantic relationship and her interruption of her Depakote. Dr. Godwin also testified that plaintiff reported being depressed and overwhelmed by her work for defendant-employer even before her 7 December 2004 work injury. *Page 9 
30. Dr. Russakov testified that plaintiff's pre-existing bipolar disorder was a "major contributing factor" of her condition, and regarding the 7 December 2004 workplace accident, testified, "I don't believe that it was a major factor in terms of it ongoing, but it triggered everything that happened."
31. When asked whether plaintiff's depression was caused by her pre-existing bipolar disorder or her work accident, Dr. Pierce responded, "As a physician that has had extensive experience with both psychiatric problems and pain problems, it was extremely challenging for me to tell which was which." Dr. Pierce also testified that plaintiff exhibited significant symptom magnification behaviors.
32. Dr. Harvey testified that she had not treated plaintiff since August of 2001, and thus was not in a position to testify about plaintiff's mental state or ability to work subsequent to that date.
33. Having considered the medical records and testimony of Drs. Russakov, Godwin, Pierce, and Harvey along with their relative expertise and experience, as well as the circumstances of their involvement with plaintiff's treatment, the Full Commission gives greater weight to the testimony and expert opinions of Drs. Godwin and Pierce.
34. Plaintiff has produced insufficient lay and medical evidence to prove by the greater weight that plaintiff's compensable 7 December 2004 accident exacerbated, materially accelerated, or materially aggravated her pre-existing mental health problems.
35. The greater weight of the evidence regarding plaintiff's earnings results in an average weekly wage of $1,192.07, which results in a workers' compensation rate of $688.00.
36. Although Dr. Pierce's notes seem to indicate a separate 23 December 2004 right knee injury, there is insufficient evidence of record to prove by the greater weight that defendant *Page 10 
filed the Form 60 in this matter as a result of an error due to fraud, misrepresentation, undue influence, or mutual mistake.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On 7 December 2004 plaintiff sustained a compensable accident when she fell down stairs at a patient's home. Defendants accepted this accident as compensable using a Form 60. N.C. Gen. Stat. § 97-2.
2. Given the credible medical and vocational evidence of record, and plaintiff's compensable accident of 7 December 2004, plaintiff was temporarily totally disabled from 19 January 2005 through the date of her return to work with ECIM in September 2005. Plaintiff is entitled to temporary total disability compensation at a rate of $688.00 per week for the period from 19 January 2005 through the date of her return to work with ECIM in September 2005, subject to the credits owed defendants for temporary total disability benefits paid, as well as for the credits owed for wages plaintiff received during her return to work with defendant-employer. N.C. Gen. Stat. § 97-29.
3. Plaintiff has failed to prove by the greater weight of the evidence that, subsequent to her return to work with ECIM in September 2005, she has been or is unable to earn the same wages she earned before her compensable accident as a consequence of the 7 December 2004 injury. N.C. Gen. Stat. § 97-2(9); Russell v. Lowe's Product Distribution,108 N.C. App. 762, 425 S.E.2d 454; (1993). *Page 11 
4. The greater weight of the evidence regarding plaintiff's earnings results in an average weekly wage of $1,192.07, which results in a workers' compensation rate of $688.00. N.C. Gen. Stat. § 97-2(5).
5. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, plaintiff is entitled to have defendants pay all medical expenses incurred or to be incurred as a result of plaintiff's compensable right ankle, right knee, and lumbar back conditions. Plaintiff is entitled to pain management as recommended by Dr. Russakov in his 5 December 2005 note. However, plaintiff is not entitled to treatment for her knee subsequent to her fall on the sailboat. N.C. Gen. Stat. § 97-25.
6. Plaintiff has produced insufficient evidence to prove by the greater weight of the evidence that plaintiff's compensable accident exacerbated, materially accelerated, or materially aggravated her pre-existing mental health problems. Plaintiff is, therefore, not entitled to any benefits or medical treatment related to her mental health problems. Holly v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750
(2003); Hodgin v. Hodgin, 159 N.C. App. 635, 583 S.E.2d 362 (2003);Young v. Hickory Bus. Furn., 353 N.C. 227, 230, 538 S.E.2d 912, 915
(2000); Brown v. Family Dollar Distrib. Ctr. 129 N.C. App. 361 (1998).
7. Regarding the payment of medical expenses, the Parsons presumption applies given the filing of the Form 60 in this case. Perez v. *Page 12 American Airlines, 174 N.C. App. 128, 620 S.E.2d 288 (2005). However, through the presentation of evidence in this case, defendants have rebutted any presumption that plaintiff's treatment for her mental health problems are related to the compensable accident, and defendants have established that plaintiff's medical treatment for these conditions is not related to plaintiff's compensable injury. Defendants are, therefore, not responsible for the medical expenses pertaining to plaintiff's mental health problems. Perez v. American Airlines,174 N.C. App. 128, 620 S.E.2d 288 (2005); Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997).
8. The North Carolina Court of Appeals has held that defendants are not responsible for a plaintiff's psychological problems that stem from a good faith handling of a workers' compensation claim, writing, "an employer should not be punished for any psychological effects that resultentirely from its good faith handling of a claim. . . ." Calloway v.Memorial Mission Hospital, 137 N.C. App. 480, 485, 528 S.E. 2d 397, 401 (2000) (Emphasis in original). In this case plaintiff has not presented sufficient evidence to prove the existence any bad faith on the part of defendants.
9. Defendants are entitled to a credit for the temporary total disability benefits paid plaintiff in this case. Defendants are also entitled to a credit for the wages plaintiff received during her post-injury work for defendant-employer. N.C. Gen. Stat. § 97-42.
10. Notwithstanding that Dr. Pierce's notes seem to indicate a separate 23 December 2004 right knee injury, there is insufficient evidence to set aside the Form 60 filed in this case. N.C. Gen. Stat. § 97-17(a).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the credits owed for the temporary total and temporary partial disability benefits already paid, as well as for the credits owed for wages plaintiff received in her return to work with defendant-employer, defendants shall pay plaintiff temporary total disability compensation at a rate of $688.00 per week for the period from 19 January 2005 through the date *Page 13 
of her return to work with ECIM in September 2005. Any unpaid amounts that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, defendants shall pay all medical expenses incurred to treat plaintiff's compensable right ankle, right knee, and lumbar back conditions, but are not responsible for treatment of plaintiff's mental health problems or her knee condition subsequent to her fall on the sailboat. Defendants shall pay for pain management as recommended by Dr. Russakov in his 5 December 2005 note.
3. Defendants' request to set aside the Form 60 in this matter must be, and hereby is, DENIED.
4. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under paragraphs 1 of this Award is approved for plaintiff's counsel and shall be paid as follows: Twenty-five percent of any lump sums due plaintiff shall be deducted and paid directly to plaintiff's counsel.
5. Defendants shall pay the costs.
This the 14th day of July 2008.
 S/___________________
 DANNY L. McDONALD
 COMMISSIONER
CONCURRING:
S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 14 
S/_____________ BUCK LATTIMORE COMMISSIONER *Page 1